THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ROBERTO DE JESÚS CABRERA, k/a EL ITALIANO, and JULIO ALFREDO ANTAS SANABRIA, k/a TARZÁN, Defendants and Appellants.

Nos. CR-65-415    Decided May 5, 1967.
CR-65-416
CR-65-417.

*Víctor Tirado Saltares* for appellants. *J. B. Fernández Badillo, Solicitor General,* and *Ida Cardona Ortiz, Assistant Solicitor General,* for The People.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

One of the most sordid and abominable crimes that can be conceived has given rise to this appeal. Roberto de Jesús Cabrera, known as El Italiano and Julio Alfredo Antas Sanabria, known as Tarzán, were convicted of two murders

in the first degree for having caused the death of Charles Fisher, by strangling him, and of Miguel A. Sánchez, by suffocating him by immersion, of two charges for grand larceny and of carrying of weapons. The contentions made to request the reversal of the judgments center on the admission in evidence of the confessions made by the defendants, which relieves us of narrating the morbid circumstances which surround the commission of the facts.

The trial was held between February 16 and 19, 1965, and, although the trial began to be held before a jury, in the course thereof, the defendants personally requested that it be continued before the presiding judge.[1] The evidence refers to two confessions, one oral and the other written, both given before former prosecuting attorney Felipe Ortiz Ortiz. As to the confessions of Roberto de Jesús Cabrera, the contention on inadmissibility is based on that: (a) they are the product of the psychological coercion exerted to force him to make them; (b) he was forced to reenact the crime and to confess after he had expressed his intention of not incriminating himself; (c) he reenacted the crime and confessed without legal assistance and without having been offered an attorney paid by the State; and, (d) he was detained for an unreasonable length of time before being taken before a judge. Regarding those of Julio Antas Sanabria, it is alleged that (a) they were made without counsel or without the offer of one paid by the State; and, (b) the

---

[1] For the purposes of this proceeding only a partial transcript of the stenographic notes has been sent up, limited to the evidence offered, to the testimonies on the manner in which the confessions were obtained. Nevertheless, the minutes for the session of February 18, 1965 (Tr. Ev. 103) shows that: "At this stage of the prosecution both defendants, through their attorneys and personally, waive the right to have the cases tried by a jury and submit themselves to a court without a jury. This waiver of the jury having been amply examined, both defendants ratify it and the court admits it because it is considered free, voluntary and intelligent and orders that the cases be continued by a court without a jury." *People* v. *Cabán Rosa*, 92 P.R.R. 844 (1965).

fact that he was a minor was not taken into consideration for the purposes of determining the voluntary nature thereof.

1. On November 7, 1964, Prosecuting Attorney Ortiz Ortiz questioned the appellants who were detained at Police Headquarters. Before beginning to examine them about the facts he made the legal warnings to them which appear in this part of his statement:

"A. The first I began to examine was Julio Antas Sanabria, known as Tarzán. I introduced myself. 'I am Prosecutor Ortiz Ortiz.' I told him that he, as presumptive defendant, had the right to abstain from testifying before me, because the Constitution guaranteed that right and that if he wished to testify, he had to do so voluntarily, without any offer from me. That he had the right to consult an attorney and that the telephone of that office or any other close by was at his disposal in case he wanted to contact any of his relatives.

Q. What else?

A. That was all I said.

Q. And what did Tarzán answer when you made those warnings, Mr. Prosecuting Attorney?

A. That he did not need an attorney to testify. That he felt guilty. More or less in those words. That he wanted to make a statement and that he was not interested in calling any relative. That at the moment he did not need any attorney to testify, that he felt guilty and had repented and was not interested in calling any relative.

Q. And did you examine him there?

A. Yes, sir.

Q. And did he answer your interrogatory?

A. Yes, sir, he answered.

.    .    .    .    .    .    .    .

Q. What did you tell El Italiano when he arrived at your former office where you investigated?

A. I told him that, as suspect in the case, he had the right to abstain from testifying because the Constitution guaranteed it. That I could not promise to help him. That he had the right to consult an attorney. That the office telephones were at his

disposal in case he wanted to contact a relative, to which he answered that he had already contacted a relative in Arecibo and that he had also talked to a policeman who is a relative of his or is married to his cousin and lived in Bayamón and that he did not need an attorney.

Q. And did you interrogate him, did you ask any questions?
A. I interrogated him at that moment.
Q. And did he answer those questions?
A. Yes, sir."

The written confessions show that similar legal warnings were made to both, more or less in the following terms:

". . . I am investigating a case where Charles Fisher and Miguel A. Sánchez were killed. According to the evidence in our possession you may be accused of these facts. The Constitution of the Commonwealth of Puerto Rico guarantees you the right to abstain from testifying if you wish to do so. If you testify it has to be voluntarily, freely, without anybody having coerced or threatened you or made you any kind of offer. You are entitled to be represented by an attorney if you wish, to advise you as to your rights and give the legal assistance you wish. If you want to you may use the telephone to call a relative. After these warnings were made, do you wish to testify?"

Both answered affirmatively, de Jesús Cabrera stating that "I would like to have my conscience clear and eliminate that desperate feeling in my soul," and Antas that "I feel guilty and repentant at what I have done and I wish to pay for the error I have committed and I make this statement voluntarily without anybody having forced, hit, or threatened me," and as to the fact that his statement could be used against him, he added: "I understand that that can send me 'home', but in spite of all that I want to make a statement to pay for my fault."

■■ Pursuant to the doctrine in *Rivera Escuté* v. *Delgado, Warden,* 92 P.R.R. 746 (1965), and *People* v. *Adorno Lorenzana,* 93 P.R.R. 768 (1966), in February 1965 when

the trial which ended in the convictions was held, there were only available for defendants the principles announced by the Federal Supreme Court in *Escobedo* v. *Illinois*, 378 U.S. 478, which had been decided June 22, 1964. Interpreting the significance and scope of this federal opinion, we said in *Rivera Escuté* that:

". . . the confession of an accused or suspect or the admissions which substantially prejudice him, obtained while in custody of the police or other competent authority during interrogation for the purpose of eliciting incriminating statements, are not admissible in evidence in the 'criminal prosecution' (1) if he was not effectively advised by the police or other competent authority, before testifying, of his absolute constitutional right to stand mute and not to incriminate himself; and (2) if he was not advised by the police or other competent authority, before testifying, of his right to have aid of counsel, the fact that the accused did not actually request it not relieving the prosecution from the obligation to advise him of his right to have it; or (3) if he requested to confer with an attorney and was not permitted to be thus assisted when his statement was obtained."

As may be observed, all the legal warnings required then were made to appellants before confessing. It is insisted upon, however, that it was also necessary to inform him of his right to legal counsel paid by the State when, as it is obvious in the case at bar, the presumptive defendants lacked the means to retain same. In *People* v. *Guadalupe Rosa, ante,* p. 180, we explained that said additional warning adopted by the Federal Supreme Court in *Miranda* v. *Arizona,* 384 U.S. 436 (decided June 13, 1966) had not been incorporated into this jurisdiction by virtue of the ruling in *Rivera Escuté, supra;* thus clarifying any interpretation which in that sense could be made by virtue of certain language we used in *Adorno Lorenzana, supra.* All that we anticipated in *Rivera Escuté* which did not appear clearly in its predecessor *Escobedo* was that, following *People* v.

*Dorado*, 398 P.2d 361, decided ten months before, defendant was not required to specifically request counsel prior to being interrogated. Summarizing, we stated that, "Although we actually did not adopt this rule in *Rivera Escuté*, the omission of such warning can be available only to defendants whose trials held subsequent to the decision of the case of Miranda," that is, after June 13, 1966.

*Carnley* v. *Cochran*, 369 U.S. 506 (1962), invoked by appellants, is distinguishable because it dealt with the assistance of counsel during the course of the trial and of the need for clearly telling the accused who took the stand on his own behalf what consequences might follow if he did testify.

2. For the purposes of disposing of the other objections to the admission of the confessions, we must make a short summary of the evidence introduced in relation to the circumstances which surrounded the taking of appellants' statements.

De Jesús Cabrera had been detained about 3:00 A.M. of November 7 in relation with an investigation which was being conducted for the offense of attempted murder committed in Punta Salinas. He denied his participation and accused Antas Sanabria as the perpetrator of the crime and requested police protection for which he was kept in the cell for people detained under custody at police headquarters. That same day, around 10:00 A.M., Antas was arrested in relation with the burglary of the automobile of Fisher, the deceased, and in relation with the murders committed. Prosecuting Attorney Ortiz Ortiz, who was on duty, was called to headquarters for the investigation of the burglary of the automobile and, because the automobile belonged to one of the victims, to determine any relationship the persons detained could have with the crime. When he arrived at headquarters he was received by the policeman on duty and one of the detectives attached to the Section of Homicides. The

air-conditioned office of the police commander was put at his disposal to conduct the interrogatory. The detained persons looked "normal," "very jovial, very charming, smiling and talkative," and did not complain at all of the treatment they had received so far, admitting that meals had been brought to them. Antas Sanabria was the first to be interrogated. Neither the prosecuting attorney nor the stenographer, the only persons present, carried or exhibited firearms. Once the warnings copied at the beginning of this opinion were made, Antas stated the facts, all of which took approximately an hour. De Jesús Cabrera was called afterwards, in the presence of Antas. The legal warnings were made to him and, when interrogated, he gave a version of the facts exonerating himself, "he said he wanted to make a statement and gave his version." In view of this attitude, Antas asked for explanations, urging de Jesús to tell the truth, but the latter insisted on denying his participation in the criminal acts. Faced with this situation Antas proposed a visit to the scene of the crime to show that he alone could not have committed the murders. They arrived at the victim's apartment between 2:30 and 3:00 o'clock in the afternoon and it was in the same condition it was left after the crimes. The "jovial and charming" attitude of both suspects persisted. When the prosecuting attorney walked in he observed two inscriptions on the wall which read "La Mafia" and commented that the handwritings were different. Then de Jesús called the prosecuting attorney aside, threw his arms around him saying "I trust you and I am going to tell you the truth." They went back to the bedroom and when Antas began to reproduce the crime, de Jesús hid behind a wardrobe, explaining that that was the position he had assumed following instructions from Antas. Afterwards both explained in detail their participation in the acts which resulted in the death of Fisher and Sánchez. During the re-enactment of the crime photographs for which the defendants

posed voluntarily were taken. Upon their return to head-quarters, about 5:00 P.M. the written confessions were taken.

José D. Feliciano, an employee of *El Mundo* newspaper, who took some photographs of the defendants signing the confessions, stated that the latter were "very gay, smiling, very willing to answer questions," and that when interrogated on how they had been treated, they answered that "very well, great."

This is in synthesis the evidence the trial court had regarding the voluntariness of the confessions. The defendants did not present any evidence on this particular, although the court expressed its willingness to hear any proof concerning this point, and only objected to its admission on the ground that the procedure for taking the confession was void because they had not been taken immediately to a judge after the arrest, and, as to Antas, on the additional ground that he had not been warned on the consequences he might suffer "if he were prosecuted in one court or another." In deciding the judge said: "All the circumstances arising from the evidence . . . have satisfied this court juridically and spiritually that the defendants were treated with the greatest respect, with the greatest consideration, and that all their rights were guaranteed. *That their statements were absolutely voluntary, although this question is not raised herein.*"

■ It is now for the first time on appeal that it is contended that the confession of Roberto de Jesús Cabrera is tainted with involuntariness because it was obtained by means of psychological pressure. However, irrespective of the conclusion reached by the trial court, we are called upon to determine in the light of the uncontroverted facts and of the inferences arising therefrom whether the confession was obtained in the manner indicated, *People* v. *Meléndez*, 80 P.R.R. 759 (1958). The circumstances recited above do not offer margin to support this contention. It is not necessary

to compare them with other more outstanding situations in which we have had the opportunity to examine similar contentions—*People* v. *Fournier*, 77 P.R.R. 208 (1954) ; *People* v. *Meléndez, supra; People* v. *Pérez*, 84 P.R.R. 173 (1961) ; *People* v. *Martínez*, 86 P.R.R. 390 (1962) ; *People* v. *Cruz*, 87 P.R.R. 124 (1963)—to reach the conclusion that there is not the slightest indicia that this appellant was submitted to any sort of pressure, physical or psychological, to wring a confession from him. What the record actually shows is an extreme pulchritude on the part of the prosecutor, and a remarkable zeal to guarantee the suspects a due process of law. The fact that originally de Jesús Cabrera denied any *active* participation in the commission of the murders, and then admitted it, is no sign, by itself, that he was coerced. A thorough examination of all the surrounding circumstances, corroborated by his expressions in the subsequent written confession, shows that his statement was the product of the dictates of his conscience to relieve him from the heavy burden which weighed upon his mind because of his action. *Cf. People* v. *Laguna Rodríguez*, 92 P.R.R. 811 (1965).

The other basic ground for impeachment—the delay in taking them before a magistrate—vanishes when all the facts are considered as a whole. We must first repeat what we said in *People* v. *Martínez, supra*, citing with approval *Fournier* and *Meléndez, supra*, to the effect that the prosecuting attorney may examine a presumptive defendant, before or after his arrest, *during a reasonable period*, and that the detention for many hours by itself is not sufficient to annul a confession. In this respect it is necessary to establish a desirable equilibrium between the acknowledgment of the rights of the defendant and the social worth which is the protection of public order in the discovery of criminal acts. What Rule 6(b) requires is that once the person is arrested he be conducted "without unnecessary delay" before

a magistrate, as provided in Rule 22 (a) which again mentions "unnecessary delay."

■ From a recital of the facts it appears that de Jesús Cabrera was arrested around three o'clock in the morning, in connection with his participation *in another offense*, with no relation to those under consideration, and that after pointing out Antas as the responsible agent, he requested protection, for which reason he was imprisoned. Antas was arrested at ten o'clock in the morning. The investigation commenced around noon. The investigation produced the oral confessions, after visiting the scene of the crime and reproducing the facts. At 5:00 o'clock in the afternoon, upon returning to headquarters, both confessions were taken down in writing. Immediately the case was submitted to a magistrate for the determination of probable cause. It cannot be maintained that there was "unnecessary delay." In view of the nature of the investigation and the steps taken, any alleged delay was reasonable in order to give the investigating officers the opportunity to be in a position to submit the case to the magistrate.

■ 3. Finally, there remains to discuss the contention that the court erred in failing to take into consideration the minority of Antas for the purpose of determining the voluntariness of his confessions.[2] In *Gallegos* v. *Colorado*, 370 U.S. 49 (1962), invoked as authority, it is merely stated that the immaturity of the defendant—he was 14 years of age—was *a circumstance* to be considered in order to determine the voluntariness of a confession insofar as it could

---

[2] It appears that in the course of the interrogatory to which Antas was submitted, he apparently made reference to his minority and allegedly produced a birth certificate which he carried to prove it. It was impossible to establish with certainty the existence of the certificate. Prosecuting Attorney Ortiz Ortiz testified that he had attempted, without success, to communicate with the judges in charge of the matters concerning minors, and with the attorneys of the Legal Aid Society.

show a thorough knowledge of the consequences of his admissions. But an examination of the divided opinion (4–3) reveals that other factors, such as the prolonged detention of five days to which he was submitted, in the absence of any relatives and without the opportunity of a more sound and mature advice, were decisive in the determination of involuntariness. In the present case, the recital of facts shows that Antas was completely aware of the consequences of his acts and that he was no immature and ignorant adolescent; the evidence reveals that this was not his first encounter with the law. See *De Souza* v. *Barber*, 263 F.2d 470 (9th Cir. 1959), and *Olivera* v. *State*, 354 P.2d 792 (Okla. 1960).

To this we must add that pursuant to § 4 of Act No. 97 of June 23, 1955, 34 L.P.R.A. § 2004, the waiver of jurisdiction depends solely on the better welfare of the child and of the community.[3] As revealed by the only proof appearing in the record, the confession given by the appellant does not

---

[3] The order of the judge of the juvenile court reads in part:

"From the oral evidence as a whole and the record as weighed by the court, it appears that on March 2, 1964, the Court placed the child on probation, by resolution, under the custody of his mother, after holding a hearing. It was impossible to carry out a rehabilitation program for the child because he abandoned the house of his mother, without leaving notice of his whereabouts, during which lapse of time he contracted marriage. It was not until the filing of the new offenses committed by the minor that his whereabouts became known.

"As revealed by the personality tests and reports mentioned in the preceding paragraphs, he is characterized as a person with serious personality complexes and disturbances, it being necessary to establish control over his conduct, because otherwise the absence of such control could result in a menace to the community's welfare.

"Consequently, pursuant to the provisions of section 4 of Act No. 97 of June 23, 1955 and considering the facilities available to establish a program in interest of the minor's rehabilitation provided by Act No. 97, no favorable changes on the problems of conduct presented by this minor can be worked out; and within the provisions of the law and the terms fixed thereby to make said changes to wit: until the minor is 21 years of age; it being further believed by this court that the problems are of such a nature that they require that the community be protected, even after the minor has reached 21 years of age."

seem to have been considered by the juvenile court in rendering its decision.[4]

We indicate, in passing, that in the incident of waiver of jurisdiction, the appellant had due assistance of counsel. *Kent* v. *United States*, 383 U.S. 541 (1966); Welch, *Delinquency Proceedings—Fundamental Fairness for the Accused in a Quasi-Criminal Forum*, 50 Minn. L. Rev. 653 (1966); note in 19 Vand. L. Rev. 1385 (1966); *cf. Application of Gault*, 407 P.2d 760 (1965), still before Federal Supreme Court, 34 U.S.L. Week 3428.

Since none of the errors assigned were committed, the judgments rendered by the Superior Court, San Juan Part, on February 19, 1965, will be affirmed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Rigau did not participate herein.

---

[4] We advance no judgment in the case of a minor who is brought before the authorities who are in charge of matters of juvenile delinquency and a confession is obtained without any warning that it may be used in an ordinary criminal prosecution if the Juvenile Court, according to law waives jurisdiction. See, *Harling* v. *United States*, 295 F.2d 161 (D.C. Cir. 1961); *In Re Holmes*, 109 A.2d 523 (Pa. 1954); *Ex Parte Tahbel*, 189 Pac. 804 (Calif. 1920); Notes in 76 Harv. L. Rev. 108–111 (1962), 50 Calif. L. Rev. 902 (1962); 15 Ala. L. Rev. 234 (1962) and 31 U.Cinc. L. Rev. 454 (1962).